IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIEL S., | ) |
| Plaintiff, | ) ) ) |
| | ) No. 18 C 5048 |
| v. | ) ) |
| ANDREW SAUL, | ) Magistrate Judge Schenkier |
| Commissioner of Social Security, | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Daniel S., moves for reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability benefits (doc. # 16: Pl.'s Mot. For Summ. J., doc. # 17: Pl.'s Mem.). The Commissioner has filed a response brief, asking this Court to affirm the Commissioner's decision (doc. # 22: Def.'s Resp.). Plaintiff has filed his reply (doc. # 23). The matter is fully briefed. For the following reasons, we grant Mr. S.'s motion and remand the case.

I.

Mr. S. applied for disability insurance benefits ("DIB") on May 29, 2014, alleging an onset date of January 1, 2011 (R. 28, 163). The ALJ made a finding that Mr. S.'s date last insured was March 31, 2017 (R. 28).[2] Mr. S.'s claim and subsequent appeal for reconsideration were both denied (R. 105, 111). Shortly thereafter, Mr. S. filed a written request for a hearing in front of an

---

[1] On September 24, 2018, by consent of the parties and pursuant to 28 U.S.C § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgement (doc. # 8).

[2] There is some dispute about the date last insured as the certified earnings record proffered by Mr. S. shows March 2019, while the disability report compiled by the field office shows March 31, 2017 (R. 187, 190). At the hearing before the ALJ in October 2016, Mr. S.'s attorney affirmed the date last insured as March 31, 2017 (R. 46). While this issue is not outcome determinative on our review, the ALJ on remand should consider it if in the event he were to find that Mr. S. was disabled after March 31, 2017 but on or before the end of March 2019.

Administrative Law Judge ("ALJ") (R. 117). Mr. S. and a Vocational Expert ("VE") testified at the hearing held on October 31, 2016 (R. 45). On January 31, 2017, the ALJ issued a decision denying Mr. S.'s claim for benefits (R. 28). The Appeals Council declined to review the ALJ's decision, making it the final word from the Commissioner (R. 1-4). *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); 20 C.F.R. § 404.981.

## II.

Mr. S. was born on February 11, 1964 (R. 46). For 10 years prior to his alleged onset date of January 1, 2011, Mr. S. worked for the State of Illinois as a home health care professional (R. 48, 90). Following his employment with the state, Mr. S. worked in a limited capacity as a custodian for the American Legion (R. 51, 90). Mr. S.'s earnings after the alleged onset date did not meet the necessary threshold requirements to constitute substantial gainful activity ("SGA") (R. 187). Mr. S. contends that he has both disabling mental and physical impairments; however, we focus on his physical impairments because the ALJ's treatment of those impairments forms the basis of our decision in this case.[3]

---

[3] The ALJ declined to evaluate Mr. S.'s mental impairments as "the record does not detail that such mental impairments will meet the durational requirements" (R. 31). However, the record indicates that Mr. S. was diagnosed by Dr. Raymond Weiss with chronic major depression, recurrent on August 18, 2015 (R. 521) and the depression diagnosis appeared in the treatment notes again in June and July of 2016 (R. 491, 494, 508, 510). Mr. S. was prescribed psychotropic medication by Dr. Weiss (R. 583). Additionally, Mr. S. met with a therapist, Mr. Raymond Coley, LCPC, a number of times in July and August 2016 and was diagnosed with anxiety and depression (R. 580-82). On remand, the ALJ should evaluate Mr. S.'s mental impairment claims as the record supports that the diagnosis of depression lasted for at least 12 months.

2

A.

Mr. S. has been receiving treatment for various maladies from Dr. Raymond Weiss since at least 2010[4] (R. 295). Specifically, Dr. Weiss has treated Mr. S. for diabetes mellitus[5] and lumbar spine pain, and has provided him referrals to other practitioners for his persistent knee and elbow pain (R. 280-82, 304-16, 517, 530). On October 26, 2012, Mr. S. visited Dr. Weiss with lower back pain and was prescribed a Medrol Dosepack (R. 280).[6] Mr. S. returned to Dr. Weiss with complaints of lower back pain in August 2014, after falling at work while lifting heavy objects (R. 347).[7] Dr. Weiss referred Mr. S. to physical therapy for treatment (R. 349).

In mid-August 2014, Mr. S. attended the first of several physical therapy sessions (R. 352). At the session, Jake Tan, PT, noted Mr. S. had issues with carrying, moving, and handling objects due to pain in the lower and middle back (R. 352). Subsequent sessions showed that while Mr. S.'s pain and stiffness in his lower back decreased, he still had trouble bending and lifting (R. 355-56). Mr. S. continued physical therapy until December 2014. Mr. S. complained that his back pain was not improving and that the use of a lumbar brace while at work made no difference (R. 407).

---

[4] The exact length of time that Dr. Weiss has treated Mr. S. is unclear. Dr. Weiss' Physical Residual Functional Capacity Questionnaire from July 2015 lists the treatment length as "10 years" (R. 594), while the Medical Source Statement of Ability to Do Work-Related Activities from October of 2016 estimates a length of "about 13 years" (R. 601). The earliest treatment notes on record are dated November 9, 2010 (R. 295).

[5] It is unclear from the record if Dr. Weiss provided the original diagnosis of Mr. S.'s diabetes or if he merely treated him. Regardless, controlling Mr. S.'s diabetes mellitus has been an ongoing issue. In March 2012, Mr. S.'s A1c (test reflecting average blood sugar levels for the past two to three months) level was high (R. 320). Dr. Weiss prescribed new medicine and by March 2013 Mr. S.'s diabetes was well controlled (R. 307). However, over the next few years, despite changing medicine and doses, control of Mr. S.'s diabetes fluctuated: in June 2013, it was reported as not controlled and Mr. S was unable to sense light touch of the feet; in July 2013, it was reported as controlled; in October 2014, Dante Pimentel, M.D. reported that it was poorly controlled and that Mr. S. experienced decreased sensation to light touch of feet; and in February 2016, the condition was reported as not controlled (R. 310-12, 314, 382, 544).

[6] Medrol is used to treat inflammation. *Methylprednisolone*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/methylprednisolone-oral-route/description/drg-20075237 (last visited July 31, 2019).

[7] The record shows that while employed at the American Legion, Mr. S. would occasionally lift garbage cans weighing 30-40 pounds. Mr. S. testified that he was unable to perform this action without the help of a co-worker (R. 51).

3

Furthermore, Mr. S. explained that although he felt better after therapy, the pain would come back and get worse at work despite his efforts to take breaks (R. 406).

In October 2014, Mr. S. was examined by Dr. Pimentel, a consultative examiner for the agency, who determined that Mr. S.'s ability to lift, carry or handle objects was mildly impaired due to lumbosacral back pain and that his ability to carry out work-related activities was also mildly impaired due to that pain (R. 383). Dr. Pimentel stated that Mr. S. was limited by 10 degrees from normal in flexion to the floor in the lumbar spine and in the cervical rotation to the left and right (R. 384). Dr. Pimentel also stated that Mr. S. could walk greater than 50 feet unassisted with normal gait and had mild difficulty in squatting and rising and hopping on one leg (R. 383-85).

In early November 2014, state agency examiner Henry Rohs, M.D., reviewed Mr. S.'s record and found severe impairments of spinal disorders and diabetes mellitus (R. 88). Dr. Rohs also opined that Mr. S. had mildly reduced range of motion and poorly controlled diabetes (R. 89). Dr. Rohs concluded that Mr. S. possessed medium work capability and was not disabled (R. 91).[8] In May 2015, Mr. S. sought reconsideration of his disability claim (R. 94). State agency examiner, Roy C. Brown, M.D., concurred with Dr. Rohs and affirmed that Mr. S. was capable of medium work and thus was not disabled (R. 102).

In December 2014, Mr. S. visited Dr. Weiss with complaints of back pain and pain in his right knee with ambulation (R. 529-30). Dr. Weiss suggested a plan of pain management for lower back pain and offered referrals to an orthopedist for knee pain (R. 530). On March 31, 2015, Dr. Weiss noted that Mr. S.'s gait and stance were normal and that he retained normal movement of all extremities but still had pain in his knees and lower back (R. 528).

---

[8] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds; if someone can do medium work, they can also do sedentary and light work." 20 C.F.R. § 404.1567(c) (2019).

4

In late April 2015, Mr. S. sought treatment for his persistent knee pain and was referred to Dr. Makda, an orthopedic surgeon (R. 502). On initial examination, Dr. Makda noted that Mr. S. had swelling in both knees and that these symptoms had persisted despite conservative management (R. 505-06). An x-ray of both knees provided no evidence of arthritis, fracture or dislocation (*Id.*). In May 2015, Mr. S. underwent an MRI of his left knee (R. 567). Dr. Makda opined that the pain was likely due to fibrocystic degenerative changes with adjacent degenerative marrow edema (R. 568).[9] An MRI of the right knee performed several days later found "no evidence of periarticular soft tissue swelling or joint effusion" (R. 565).

On July 7, 2015, Dr. Weiss completed a Physical Residual Functional Capacity Questionnaire ("RFC Questionnaire"). Dr. Weiss provided a prognosis of "fair" and indicated that Mr. S. could sit for one hour at a time and stand for an hour and 15 minutes at one time (R. 594). In addition, Mr. S. could sit for less than two hours and stand/walk for about four hours total in an eight-hour working day if provided extra breaks (R. 595). Dr. Weiss opined that Mr. S. could "rarely" lift and carry 20 lbs, 10 lbs, or less than 10 lbs in a competitive work situation (*Id.*). Furthermore, Dr. Weiss opined that Mr. S. would likely be absent from work for more than four days per month (R.595-96). Dr. Weiss indicated that Mr. S.'s pain would frequently interfere with the attention and concentration needed to perform simple work tasks, and that humidity and wetness would exacerbate the pain *(Id.)*.

In December 2015, Mr. S. received a cortisone injection from Dr. Makda to alleviate pain from lateral epicondylitis in his left elbow and was advised to wear an armband (R. 517).[10] In May

---

[9] Edema is swelling caused by excess fluid trapped in the body's tissues. *Edema*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/edema/symptoms-causes/syc-20366493 (last visited July 31, 2019).

[10] Lateral epicondylitis, commonly known as tennis elbow, occurs when tendons in the elbow are overloaded, usually by repetitive motions of the wrist and arm. *Tennis Elbow*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/tennis-elbow/symptoms-causes/syc-20351987 (last visited July 31, 2019).

5

2016, Mr. S., on referral from Dr. Weiss, visited Craig Shouse, DPM, to have a diabetic foot screening. Dr. Shouse opined that Mr. S. had symptoms consistent with diabetic neuropathy[11] (R. 499).

On May 18, 2016 Mr. S. received MRIs of his lumbar spine regarding recurrent lower back pain and of his elbows regarding bilateral elbow pain (R. 542-43). The MRI revealed moderate to severe degenerative changes of the lumbar spine at L5-S1 (R. 542), but no evidence of elbow effusion, fracture or dislocation (R. 543).

In July 2016, Mr. S. again followed up with Dr. Weiss with complaints of pain in his knees, feet, elbows and back (R. 491, 493). Dr. Weiss suggested treatment of "disc diet and exercise" and a follow up in three months (R. 494).

On October 28, 2016, Dr. Weiss filled out a Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") and indicated that Mr. S. could sit for between 0-2 hours during an eight-hour workday, stand/walk for 1 hour during an eight-hour workday and would need to alternate between sitting and standing every 15 minutes while on the job to relieve pain and discomfort (R. 601). Additionally, Dr. Weiss found that Mr. S. could rarely lift less than 10 lbs, occasionally lift 10 lbs, could never push or pull and was limited to rarely performing various manipulative activities (reaching all directions, handling, fingering, feeling) (*Id.*). Dr. Weiss also stated that Mr. S.'s pain would occasionally interfere with his concentration to perform work tasks, that several environmental limiting conditions must be avoided including: dust, humidity, fumes, temperature extremes and hazards (machinery and heights), and that Mr. S. was likely to be absent from work more than four days a month due to his impairments (R. 602).

---

[11] Diabetic neuropathy is a type of nerve damage that can occur in individuals with diabetes. It primarily affects nerves in the legs and feet. *Diabetic Neuropathy*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/diabetic-neuropathy/symptoms-causes/syc-20371580 (last visited July 31, 2019).

**B.**

On October 31, 2016, at a hearing before the ALJ, Mr. S. testified that he could sit for a half hour to 45 minutes, stand in one place for 20 minutes, walk for three blocks before needing to sit, and could lift 10-15 pounds (R. 62). Additionally, Mr. S. testified that he could stoop, kneel, and crouch a little bit but the actions would be followed by pain (R. 64). Mr. S. testified that he "lay[s] around the house all day," and is able to help with the laundry and the dishes but that his 19-year-old son is responsible for much of the household work (R. 65). Mr. S. testified that he spent much of his day watching television but that he felt pain while sitting and would have to stand, move around and stretch (R. 68, 73). Mr. S. testified that he had been prescribed Hydrocodone by Dr. Weiss in an attempt to ameliorate pain but that he was frightened of taking too many and becoming addicted to the medicine (R. 54-55, 73).[12]

During the hearing, the ALJ provided the VE with a number of hypothetical limitations in order to determine Mr. S.'s employment prospects (R. 78-83). The ALJ asked whether work was available for a person with Mr. S.'s age, education, work experience and a residual functional capacity ("RFC") of light work with additional limitations (*Id.*). The VE testified that someone with a light exertional level and the additional limitations in the hypothetical would be able to work as a shirt presser, a sorter or a cleaner (R. 79-80). Additionally, the VE testified that if the individual exceeded customary limits regarding absenteeism or rest breaks the individual would be precluded from those jobs (R. 81).[13] The VE also testified that if the individual was limited to

---

[12] Hydrocodone is a medication that acts on the central nervous system to relieve pain. *Hydrocodone*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/hydrocodone-and-acetaminophen-oral-route/description/drg-20074089 (last visited July 31, 2019). It appears Mr. S. was prescribed Hydrocodone five days before the hearing (R. 72). The prescription does not appear anywhere in the treatment notes.

[13] The VE testified that the customary limit regarding acceptable absenteeism is one and a half days of work missed per month (R. 80). Regarding extended rest breaks, the VE testified that if an employee is off task more than 12 minutes beyond what is customarily provided (half hour lunch and two 15-minute breaks), the employee will be terminated (R. 81).

7

lifting no more than 10 pounds on a frequent or occasional basis, that individual would be precluded from the jobs identified (R. 82). Finally, the VE testified that if an individual needed the ability to alternate at will between sitting and standing throughout the workday, they would be unable to perform the work available (*Id.*).

## C.

On January 31, 2017, the ALJ, following the five-step sequential evaluation process, determined that Mr. S. was not disabled (R. 37). At Step One, the ALJ found that Mr. S. had not engaged in substantial gainful activity since January 1, 2011 (R. 30). At Step Two, the ALJ found that Mr. S. had two severe physical impairments: diabetes mellitus and disorder of the lumbar spine (*Id.*). At Step Three, the ALJ determined that Mr. S.'s combination of impairments did not meet or equal the criteria of an impairment listed in 20 C.F.R. §404.1520(d), 404.1525 and 404.1526 (R. 31).

Before continuing to Step Four, the ALJ reviewed the record and determined Mr. S. had the RFC to perform light work with limitations: he can frequently balance and climb stairs; can never climb ladders; can occasionally stoop, kneel, crouch and crawl; should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes such as odors and dust, and hazardous machinery; should avoid exposure to unprotected heights; and is limited to simple, routine tasks to be performed without fast-paced production requirements (R. 32).[14] At Step Four, the ALJ determined that Mr. S. lacked the RFC to perform the requirements of his past relevant

---

[14] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b) (2019).

work (R. 35). Finally, at Step Five, the ALJ ruled that there were a significant number of jobs in the national economy that Mr. S. could perform based on his RFC even with additional limitations (R. 36).

In support of his RFC finding, the ALJ concurred with the opinions of the consultative doctors, Dr. Rohs, Dr. Brown, and Dr. Pimental regarding Mr. S.'s ability to work (R. 34). However, recognizing that additional evidence had been provided since their reports in 2014 and 2015, the ALJ did not accept their conclusion that Mr. S. could perform medium work, and instead assigned a light RFC with the additional limitations mentioned above. The ALJ acknowledged that images of Mr. S.'s lumbar spine from the May 2016 MRI detailed "moderate to severe degenerative changes at L5-S1" and that Mr. S. was observed to have pain "with flexion and extension of the lumbar spine" (R. 33). However, the ALJ highlighted several exams from 2014 showing that Mr. S. had "normal gait and stance" and that apart from a 10 degrees limitation "from normal in the cervical rotation to the left and right and in flexion to the floor," Mr. S.'s cervical and lumbar spine range of motions were normal (*Id.*).

The ALJ gave "little weight" to the opinions of Dr. Weiss (*Id.*). The ALJ found that Dr. Weiss' RFC Questionnaire from July 2015 stating that Mr. S. "could sit for less than two hours in an eight-hour workday" was internally inconsistent with his opinion that Mr. S. "could sit for one hour at a time" from the same questionnaire (R. 34). Additionally, the ALJ found Dr. Weiss' opinion from a July 2016 examination that Mr. S.'s functional status and cognitive status were normal to be inconsistent with his Medical Source Statement from October 2016 (*Id.*).[15] The ALJ

---

[15] The ALJ did not explain why he found Dr. Weiss' July 2016 treatment notes regarding Mr. S.'s functional and cognitive status to be inconsistent with his subsequent opinions or why he found inconsistent Dr. Weiss' July 2015 opinion regarding the length of time Mr. S. was able to sit at one time and the total amount of time he could sit while at work (R. 34).

9

also found Dr. Weiss' opinions to be inconsistent with the results of the April 2015 testing of Mr. S.'s knees (*Id.*). However, based on Mr. S.'s testimony, the ALJ did adopt the environmental limitations opined by Dr. Weiss (*Id.*).

The ALJ also found the evidence did not support the severity of such impairments claimed by Mr. S. Specifically, the ALJ found Mr. S.'s allegations to be inconsistent with his "admitted" activities (R. 35). Mr. S. testified he was currently able to engage in personal care including some cooking, cleaning and grooming without assistance (*Id.*). The ALJ, relying on Mr. S.'s Function Report from September 2014, also noted that Mr. S. was able to care for his "child" at home "without any particular assistance," an activity which the ALJ recognized could be "quite demanding ... physically" (*Id.*).[16] Furthermore, the ALJ found Mr. S.'s sitting limitations to be inconsistent with his testimony regarding his fondness for watching sports on television (*Id.*). The ALJ also found that Mr. S.'s treatment records suggest that his range of motion in the lumbar spine was close to normal limits (*Id.*). Moreover, the ALJ found the record to contain "temporary work restrictions," *i.e.*, restrictions not intended to limit Mr. S. for more than a short period of time (R. 35). The ALJ noted that these opinions appeared during a "period of exacerbation" and as temporary restrictions they did not render complete statements as to Mr. S.'s condition and were thus entitled to no weight (*Id.*).

### III.

We review the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is a standard that "requires more than a mere scintilla of proof and instead such relevant evidence as a reasonable mind might accept as adequate

---

[16] We note that Mr. S.'s "child" was 17-years-old when the Function Report was originally completed and 19-years-old when Mr. S. testified before the ALJ (R. 221, 48). Additionally, in the Function Report and in his testimony, Mr. S. stated that his son performed many of the daily chores including the shopping and cleaning (R. 222, 65-66).

to support a conclusion." *Walker v. Berryhill,* 900 F.3d 479, 482 (7th Cir. 2018) (internal quotation marks and citation omitted). Our deference allows us to overturn the ALJ's decision only if it is patently wrong. *Curvin v. Colvin,* 778 F.3d 645, 651 (7th Cir. 2015). Mr. S. makes three arguments in favor of remand: (1) the ALJ erred by improperly weighing the opinion of the treating physician, Dr. Weiss (doc # 17: Pl.'s Mem. at 10-13), (2) the ALJ's finding of functional limitations was not substantially supported by the record (*Id.* at 5-10), and (3) the ALJ erred by improperly assessing Mr. S.'s symptoms *(Id.* at 13-15). We remand on the basis that the ALJ erred in giving "little weight" to the functional assessments provided by his treating physician, Dr. Weiss, therefore we need not address Mr. S.'s remaining arguments.[17]

Dr. Weiss was Mr. S.'s treating physician and had been examining him for over a decade at the time of the ALJ ruling. "A treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is consistent with other evidence in the record." *Gerstner v. Berryhill,* 879 F.3d 257, 261 (7th Cir. 2018); *see* 20 C.F.R. § 404.1527(c)(2); *Lambert v. Berryhill,* 896 F.3d 768, 774 (7th Cir. 2018).[18] When an ALJ does not give controlling weight to a treating physician, they then evaluate the opinion by following the factors outlined in 20 C.F.R. §404.1527(c)(2)-(6). These factors include: length of the treatment relationship and the frequency of examination; nature and extent of the

---

[17] However, we also note that in finding the evidence did not support the severity of Mr. S.'s alleged impairments, the ALJ disregarded testimony from Mr. S. regarding his current ability to perform daily activities (R. 65-67) in favor of statements made two years prior (R. 221). Moreover, the ALJ conflated Mr. S's ability to perform certain daily activities with his ability to perform full-time work, which runs contrary to the Seventh Circuit's clear and repeated guidance that there is a distinction between the activities of daily life and the activities of a full-time job. *Hill v. Colvin,* 807 F.3d 862, 869 (7th Cir. 2015); *see Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012) (detailing how performance of various daily activities is distinct from the requirements of employment). The ALJ's opinion that Mr. S. engaged in personal care is equivalent to being "quite functional" is exactly the type of determination the Seventh Circuit has warned against.

[18] The treating-physician rule has been modified to eliminate the "controlling weight" instruction for claims filed after March 27, 2017, but the previous rule still applies to Mr. S's claim filed prior to that date. *See Gerstner,* 879 F.3d at 261.

treatment relationship; supportability; consistency; specialization; and other factors. *Knapp v. Berryhill*, 741 Fed. Appx. 324, 327-28 (7th Cir. 2018); *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). The ALJ may not disregard the opinion of a treating physician without offering "a good reason." *Walker*, 900 F.3d at 485. The ALJ's treatment of Dr. Weiss' evidence failed to meet this standard.

### A.

At the outset, the ALJ failed to follow the regulatory factors that are to be used in assessing the weight to be given to a treater's opinion. Dr. Weiss has been Mr. S.'s doctor for over a decade and has treated him consistently for back pain and diabetes mellitus. The ALJ was thus required to address the details of the treatment relationship and explain why he was giving the opinion "little weight." *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016). Here, the ALJ did not discuss many of the regulatory factors—he did not discuss the length and frequency of the treating relationship, the nature and extent of the treatment, nor supportability for Dr. Weiss' opinions found in the record either from specialists Dr. Weiss referred Mr. S. to or from Mr. S.'s testimony.[19] While an ALJ need not explicitly weigh every factor, he must sufficiently account for the factors and build an accurate and logical bridge from the evidence to the conclusion. *Schreiber v. Colvin*, 519 Fed. Appx. 951, 959 (7th Cir. 2013). Here, the ALJ failed to adequately do so.

In explaining his decision not to give Dr. Weiss' opinions controlling weight, the ALJ stated that Dr. Weiss' Medical Source Statement and RFC Questionnaire were inconsistent with his treatment notes from July 2016, in which Dr. Weiss indicated that Mr. S.'s functional and cognitive status were all normal (R. 34). However, in the July 2016 treatment notes under

---

[19] The ALJ's assessment of Mr. S.'s diabetes mellitus ends with testing records from February of 2016—which show Mr. S.'s A1c levels elevated beyond the level for optimal control. There is no mention of testing that occurred in May 2016 in which Mr. S. was diagnosed by a specialist with bilateral diabetic neuropathy (R. 499-501), evidence that may corroborate Dr. Weiss' Medical Source Statement.

12

"objective information," Dr. Weiss also indicated that Mr. S. had pain with flexion and extension in the LS spine and in the knees (R. 493). "An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." *Gerstner*, 879 F.3d at 262 (quoting *Campbell*, 627 F.3d at 301). The ALJ failed, impermissibly, to view Dr. Weiss' treatment notes in their totality and instead "plucked notes" from a portion of one visit. *Knapp v. Berryhill*, 741 Fed. Appx. 324, 328 (7th Cir. 2018). Moreover, the ALJ found that Dr. Weiss' opinion regarding the severity of Mr. S.'s knee condition was inconsistent with testing from April 2015 that showed Mr. S.'s knees were stable (R. 505-06). However, MRI testing from May 2015, the very next month, found Mr. S. to be suffering from knee pain likely related to fibrocystic degenerative changes with adjacent degenerative marrow edema (R. 568). "ALJs are not permitted to cherry-pick evidence from the record to support their conclusions, without engaging with the evidence that weighs against their findings." *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018). Here, the ALJ did just that by ignoring subsequent testing that supported Dr. Weiss' RFC Questionnaire and Medical Source Statement.

The ALJ also gave "little weight" to Dr. Weiss' July 7, 2015 RFC Questionnaire because he found it to be "internally inconsistent" in stating that Mr. S. could sit for less than two hours in an eight-hour workday but could also sit for one hour at a time (R. 34). The ALJ did not explain why these observations were necessarily inconsistent.[20] It is reversible error to reject a treating physician's opinion because of a perceived inconsistency without "minimally articulating" some rationale for the rejection. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *see Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

---

[20] For example, it is possible that Mr. S. could sit for up to one hour at a time once during the day, but still only sit for less than a total of two hours in an eight-hour work day. Dr. Weiss may have been contemplating the maximum amount of time Mr. S. could sit at a given time and not expect both to occur on any single work day.

The ALJ further found Dr. Weiss' RFC Questionnaire and Medical Source Statement inconsistent with Mr. S.'s testimony that he "spent much of his time watching sports on television" (R. 34). The ALJ did not explain why he found Dr. Weiss' opinions to be inconsistent with Mr. S.'s testimony. Mr. S. testified that he spent much of his day laying around (R. 65) but that he felt pain while sitting and would have to stand and stretch (R. 68). Furthermore, Mr. S. testified that he could only sit for 30-45 minutes at a time before his knees and back would begin hurting (R. 62) and that he could not spend the day sitting because he was always in pain (R. 74). These reasons offered by the ALJ to give "little weight" to Dr. Weiss' opinions are inadequate to "build an accurate and logical bridge between the evidence and the result." *Lambert,* 896 F.3d at 774.

### B.

Instead of giving controlling weight to Dr. Weiss' opinions, the ALJ relied on the opinions of Dr. Rohs, Dr. Brown (neither of whom physically examined Mr. S.) and Dr. Pimentel (who examined Mr. S., once, in 2014) who all opined that Mr. S. could perform medium work (R. 34). The ALJ recognized the opinions of these doctors were made prior to all submitted evidence and thus the ALJ himself lowered the RFC finding from medium to light work, and added additional limitations (R. 34, 36). However, an ALJ may not play doctor and the additional medical evidence should have been subjected to medical scrutiny. *Goins v. Colvin,* 764 F.3d 677, 681 (7th Cir. 2014). In *Goins,* the claimant received an MRI while his supplemental social security application was pending. *Id.* at 679. The MRI, which showed degenerative disc disease—among other complications—was not subjected to medical scrutiny. *Id.* at 680. Instead, the ALJ summarized the results in "barely intelligible medical mumbo-jumbo," and did not use the results of the MRI as an aid in evaluating claimant's testimony. *Id.* The Seventh Circuit found the actions of the ALJ impermissible and ordered a remand.

14

Similarly, Mr. S. received an MRI while his disability application was pending. Dr. Weiss treated Mr. S. after his May 2016 MRI for pain in the LS spine (R. 493) and provided the Medical Source Statement in October 2016 in which he detailed Mr. S.'s inability to work (R. 601-602). The ALJ recited the results of the May 2016 MRI and the July 2016 treatment notes stating that Mr. S. "was observed to have pain with flexion and extension of the lumbar spine" (R. 33). The ALJ then commented that this condition was "treated conservatively" (*Id.*). To the extent this reference to conservative treatment was intended to minimize the significance of the MRI and the subsequent treatment notes, that is a medical judgment that the ALJ was not entitled to make without the aid of expert opinions. *Moreno v. Berryhill*, 882 F.3d 722, 729 (7th Cir. 2018) (holding that even medical records that may show improvement cannot be assessed solely by the ALJ). And, that expert opinion did not come from the agency consultants, who assessed Mr. S.'s condition more than one year before the May 2016 MRI.

An ALJ may not rely on outdated opinions from the agency consultants if new evidence could reasonably change those opinions. *Lambert*, 896 F.3d at 776. Here, we cannot say an MRI that showed "moderate to severe degenerative changes" may not have made a difference to the agency consultants. On remand, the ALJ should have the benefit of medical opinion as to the import of the MRI.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment (doc. # 16) is granted. We remand the case for further proceedings consistent with this opinion. The case is terminated.

ENTER:

_____
**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

DATED: July 31, 2019